UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DAYS INN WORLDWIDE, INC., f/k/a
DAYS INN OF AMERICA, INC.,

        Case No. 07-13523

     Plaintiff/Counter-Defendant,        Hon. Lawrence P. Zatkoff

v.

ADRIAN MOTEL COMPANY, LLC ("Licensee"),
 and MAZAH BARBAT, MATT KARMO, JEHAN
BARBAT, YELDA ATTY, and FERIS ATTY
(the "Guarantors") (collectively, the "Karmo
Defendants"),

     Defendants/Cross-Defendants/Cross-Plaintiffs,

and

JAMAL S. KALABAT, LENAWEE HOTEL,
INC., and ADRIAN PROPERTIES, LLC
(collectively, the "Kalabat Defendants"),

     Defendants/Counter-Plaintiffs/Cross-Plaintiffs/Cross-Defendants.
_____/

**OPINION AND ORDER**

AT A SESSION of said Court, held in the
United States Courthouse, in the City of Port Huron,
State of Michigan, on September 30, 2009

PRESENT: THE HONORABLE LAWRENCE P. ZATKOFF
UNITED STATES DISTRICT JUDGE

## I.  INTRODUCTION

Presently before the Court are three substantive motions:

    A.    Motion for Partial Summary Judgment filed by the Kalabat Defendants
        (Docket #45).  Plaintiff and the Karmo Defendants each have filed a
        response, to which the Kalabat Defendants filed a reply.

  B.  Motion for Partial Summary Judgment filed by Plaintiff (Docket #46).  The Karmo Defendants and the Kalabat Defendants each have filed a response to Plaintiff's Motion for Partial Summary Judgment, and Plaintiff has filed a reply to each of those responses.

  C.  Motion for Summary Judgment filed by Plaintiff as to the Counter-claims asserted by the Kalabat Defendants (Docket #47).  The Kalabat Defendants have filed a response, and Plaintiff filed a reply.

The Court finds that the facts and legal arguments pertinent to each of the three Motions are adequately presented in the parties' papers, and the decision process will not be aided by oral arguments.  Therefore, pursuant to E.D. Mich. Local R. 7.1(e)(2), it is hereby ORDERED that the Motions be resolved on the briefs submitted, without this Court entertaining oral arguments.  For the reasons that follow,

  1.  The Kalabat Defendants' Motion for Partial Summary Judgment is GRANTED IN PART and DENIED IN PART;

  2.  Plaintiff's Motion for Partial Summary Judgment is GRANTED IN PART and DENIED IN PART; and

  3.  Plaintiff's Motion for Summary Judgment on the Counter-claims asserted by the Kalabat Defendants is GRANTED.[1]

## II. BACKGROUND

Plaintiff is a provider of guest lodging facility services in the United States, and it has marketed and provided guest lodging facility services for several decades. Plaintiff utilizes the Days Inns® System ("System"), which provides hotel services to the public under the Days Inns name

---

[1]The Court also (a) denies the Motion to Strike (Docket #62) filed by Plaintiff for the reasons set forth in the Kalabat Defendants' response thereto, (b) grants the unopposed Motion for Extension of Time to File Response/Reply (Docket #64) filed by the Kalabat Defendants for the reasons set forth therein, and (c) grants the unopposed Motion for Leave to File Excess Pages (Docket #65) filed by the Kalabat Defendants for the reasons set forth therein.

and certain services to its licensees, including a centralized reservation system, advertising, publicity and training services. Plaintiff has the exclusive right to sublicense the use of various trade names and service marks registered on the principal register of the United States Patent and Trademark Office, logos and derivations thereof (the "Days Inns Marks"). Plaintiff uses and has used the words "Days Inns," and others, as Days Inn Marks since the date of their registration.

Plaintiff conducts its business through a system of franchisees, or licensees, through which Plaintiff provides guest lodging services to the public using the Days Inns Marks. In order to develop goodwill in the Days Inn Marks, Plaintiff has invested substantial effort over a long period of time, including the expenditure of substantial sums of money, to cause consumers throughout the United States to recognize the Days Inn Marks as distinctly designating guest lodging services as originating with Plaintiff. The value of the goodwill developed in the Days Inn Marks cannot be precisely calculated in monetary terms, but because Plaintiff is one of the largest guest lodging facility license systems in the United States, its value is substantial.

On or about October 11, 1996, Plaintiff entered into a license agreement (the "License Agreement") with Defendant Adrian Motel Company, LLC (the "Licensee") for the operation of a guest lodging facility located at 1575 West Maumee Road, Adrian, Michigan 49221 (the "Facility"). The Facility consists of 80 authorized guest rooms. Pursuant to Sections 1 and 5 of the License Agreement, Licensee was obligated to operate the Facility as a Days Inns guest lodging facility for a 15-year term, during which time Licensee would be permitted to use the Days Inn Marks in association with the operation and use of the Facility.

Pursuant to Sections 7 and 18 and Schedule C of the License Agreement, Licensee was required to make certain periodic payments to Plaintiff for royalties, service assessments, taxes,

3

interest, reservation system user fees, annual conference fees, and other fees (collectively, "Recurring Fees"). Pursuant to Sections 12.1 and 18.7 of the License Agreement, Licensee further agreed that, in the event of a premature termination of the License Agreement, Licensee would pay liquidated damages of no more than $1,000 per utilized room to Plaintiff ("Liquidated Damages").

Pursuant to Section 9 of the License Agreement, Licensee could not lease the Facility or engage in any change, assignment, transfer, conveyance, or pledge of its interest, except with Plaintiff's prior written consent. Section 9 of the License Agreement also provided that, in the event Licensee assigned, transferred, conveyed or otherwise pledged its interest to a third-party transferee without: (1) Plaintiff's prior written approval, and (2) the execution of a new license agreement with the third-party transferee, such third party transferee was prohibited from operating the Facility as a Days Inns guest lodging facility. In addition, pursuant to Section 9.5, if prior written consent was not obtained, Licensee remained liable for payment and performance under the License Agreement until: (a) Plaintiff terminated the License Agreement, and (b) Licensee ceased use of the Days Inn Marks at and/or in reference to the Facility. Licensee also remained responsible for performing the post-termination obligations specified in Section 13 of the License Agreement (including Section 13.2, which required that Licensee pay Recurring Fees so long as the Facility was identified as a Days Inn) if such third party transferee did not have a System license from Plaintiff. Finally, Licensee also agreed: (1) interest would be payable "on any past due amount payable to [Plaintiff] under th[e] [License] Agreement at the rate of 1.5% per month," and (2) Licensee would "pay all costs and expenses, including reasonable attorneys' fees, incurred by the prevailing party to enforce [the License] Agreement or collect amounts owed under [the License Agreement]."

4

Concurrent with the execution of the License Agreement, Defendants Matt Karmo, Mazah Barbat, Jehan Barbat, Yelda Atty, and Feris Atty (the "Guarantors") provided Plaintiff with a joint and several guaranty of Licensee's obligations under the License Agreement (the "Guaranty"). Pursuant to the terms of the Guaranty, each Guarantor agreed, among other things, that upon a default under the License Agreement, he would "immediately make each payment and perform or cause [Licensee] to perform each unpaid or unperformed obligation of [Licensee] under the [License] Agreement."

When Licensee was unable to meet its mortgage obligations in 2002, National City Bank filed a lawsuit against Licensee. A court-appointed receiver was appointed to sell Licensee's assets, including the Facility. In July 2003, Licensee sold the Facility (the "Sale") to Defendants Lenawee Hotel, Inc. ("Lenawee Hotel") and Adrian Properties, LLC ("Adrian Properties") (collectively, the "Corporate Kalabat Defendnts"), without any notice to or consent from Plaintiff.

When the Corporate Kalabat Defendants took possession of the Facility on July 24, 2003, they continued to operate the Facility utilizing the Days Inn Marks. None of the Defendants, however, communicated to Plaintiff that the Corporate Kalabat Defendants, rather than Licensee, were operating the Facility. The Kalabat Defendants state that they believed that the Karmo Defendants would be responsible for transfer of the License Agreement to Lenawee Hotel, and the Karmo Defendants maintain that they understood that the Kalabat Defendants would be responsible for said transfer. Ultimately, neither party pursued a transfer of the License Agreement from Plaintiff, and no assignment of the License Agreement was ever made. Instead, in January 2004, Licensee (on its own behalf, not on behalf of any of the Kalabat Defendants) entered into a payment plan addendum to the License Agreement that set forth the manner by which Licensee would fulfill

5

its overdue payment obligations.  When Licensee returned the signed addendum to Plaintiff, it included the initial check due under the payment plan - a check from "Lenawee Hotel, Inc." made out to Plaintiff with the Adrian Days Inn site number (9937) on the check.  On December 22, 2004, Licensee signed another written addendum to the License Agreement (again, on its own behalf and not on behalf of any of the Kalabat Defendants).

Commencing with the initial check that accompanied the payment plan addendum in January 2004, Plaintiff received payments earmarked for the Facility at Plaintiff's lockbox.  Each payment was in the form of a check from "Lenawee Hotel, Inc." and each included the number "9937," which was the number for the Adrian Days Inn site, or "9937-2056," which reflected the site number (Adrian) and operator number (Licensee) for the Facility.  Most of the checks were signed by Defendant Matt Karmo, one of the members of Licensee.  For each such check, Plaintiff cashed the check and credited Licensee's account.  The last check Plaintiff received and applied to Licensee's account was dated November 18, 2005.  By letters to Licensee dated January 19, 2006, June 23, 2006, and November 27, 2006, Plaintiff demanded payment of outstanding accounts receivable from Licensee.  Although Plaintiff received no payments from any source related to the Facility after November 18, 2005, it is undisputed that the Corporate Kalabat Defendants continued to operate the Facility using the Days Inn Marks for more than 18 months after the payments to Plaintiff ceased.

On or about May 14, 2007, Plaintiff commenced suit in New Jersey state court against Licensee and the Guarantors to collect the past due accounts receivable balance (for outstanding Recurring Fees).  Plaintiff also terminated the License Agreement, effective June 1, 2007.  Licensee removed the action to the District Court for the District of New Jersey and moved to dismiss or transfer venue to this Court.  By agreement of the parties, the case was transferred to this Court.  In

6

the course of the New Jersey proceedings, Plaintiff was notified in writing for the first time that Licensee, without Plaintiff's prior written consent, (1) transferred certain of Licensee's assets, including the Facility, and (2) Lenawee Hotel had been operating the Facility under the Days Inn Marks since the Sale. On September 6, 2007, Plaintiff sent a cease and desist letter to the Kalabat Defendants, wherein Plaintiff demanded that they de-identify the Facility as a Days Inn hotel.

When the Kalabat Defendants did not de-identify the Facility, Plaintiff filed its First Amended Complaint on October 8, 2007, wherein it added claims against the Kalabat Defendants and concurrently sought injunctive relief. On or about October 18, 2007, the Kalabat Defendants agreed to a Stipulated Order Granting Preliminary Injunction, wherein they agreed to de-identify the Facility (which de-identification had been completed on October 16, 2007).

Plaintiff asserts it has suffered the following damages:

1.  Accounts receivable on outstanding Recurring Fees for the Facility in the amount of $115,210.78 as of October 15, 2008, plus interest going forward on the principal amount of $89,988.15 at the rate of 1.5% per month;

2.  Liquidated damages of $77,000;

3.  Infringement damages of $128,755.06 (*i.e.,* the accounts receivable of $115,210.78[2] (for July 24, 2003 through June 1, 2007), plus $13,544.28 (for June 1, 2007 through October 16, 2007)), plus treble damages of $386,265.18 as of October 15, 2008; and

4.  Plaintiff's attorneys' fees and costs for this action as of the date it filed its Motions were approximately $60,000, which amounts have continued to accrue.

## III.  STANDARD OF REVIEW

---

[2]To the extent Licensee satisfies part or all of the accounts receivable amount due Plaintiff, Plaintiff agrees that it would credit that recovery against the infringement damages.

Summary judgment is appropriate only if the answers to the interrogatories, depositions, admissions, and pleadings, combined with any affidavits in support show that no genuine issue as to any material fact remains and that the moving party is entitled to a judgment as a matter of law. *See* FED. R. CIV. P. 56(c). A genuine issue of material fact exists when there is "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986) (citations omitted). In application of this summary judgment standard, the Court must view all materials supplied, including all pleadings, in the light most favorable to the non-moving party. *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). "If the evidence is merely colorable or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted).

The moving party bears the initial responsibility of informing the Court of the basis for its motion and identifying those portions of the record that establish the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party has met its burden, the nonmoving party must go beyond the pleadings and come forward with specific facts to demonstrate that there is a genuine issue for trial. *See* FED. R. CIV. P. 56(e); *Celotex*, 477 U.S. at 324. The nonmoving party must do more than show that there is some metaphysical doubt as to the material facts. It must present significant probative evidence in support of its opposition to the motion for summary judgment in order to defeat the motion for summary judgment. *See Moore v. Phillip Morris Co.*, 8 F.3d 335, 339-40 (6th Cir. 1993).


**IV.    PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT WITH RESPECT TO ITS FIRST AMENDED COMPLAINT**

**A.    Breach of Contract and Guaranty by Licensee and the Guarantors**

8

Plaintiff moves for summary judgment on the breach of contract claims asserted in its First Amended Complaint: Count I (breach of the License Agreement for failure to pay Recurring Fees against Licensee), Count II (breach of the License Agreement for failure to pay liquidated damages against Licensee) and Count VI (breach of Guaranty against Guarantors). The License Agreement provides that New Jersey law applies. Under New Jersey law, if the terms of a contract are unambiguous, the court may construe the meaning or requirements of a contract as a matter of law for purposes of summary judgment. *Nevets C.M., Inc. v. Nissho Iwai Am. Corp.*, 726 F.Supp. 525, 531 (D.N.J. 1989), *aff'd*, 899 F.2d 1218 (3d Cir. 1990). No party has argued that the terms of the License Agreement or the Guaranty are ambiguous, and the Court finds that (1) the relevant contractual provisions are not reasonably susceptible to differing interpretations, and (2) each such interpretation has been admitted by Licensee and the Guarantors. Accordingly, there is no ambiguity to be resolved that would preclude summary judgment. *See American Cyanamid v. Fermenta Animal Health Co.*, 54 F.3d 177, 181 (3d Cir. 1995).

The elements a plaintiff must demonstrate to succeed on a breach of contract claim are: the existence of a contract, performance by the plaintiff, breach by the defendants, and resulting damages. *See, e.g., Coyle v. Englanders*, 199 N.J.Super 212, 223 (App.Div. 1985) (citing *Strong v. Commercial Carpet Co., Inc.*, 722 N.E.2d 387, 391 (Ind.App. 1975)). In this case, Licensee and the Guarantors have not denied that the elements of the breach of contract/breach of guaranty claims have been established. First, there is no dispute as to the existence of the License Agreement and Guaranty. Second, no party has argued that Plaintiff failed to perform its obligations under the License Agreement as Plaintiff allowed Licensee to use the Days Inns Marks. Third, it is undisputed that: (a) the License Agreement required Licensee to make certain periodic payments of Recurring

9

Fees to Plaintiff (and the Guaranty required the Guarantors to do so if Licensee did not), (b) the Recurring Fees payment obligations continued even after a transfer of the Facility to another party if such party did not enter into a license agreement with Plaintiff pursuant to Sections 9.5 and 13 of the License Agreement (as was the case with the Kalabat Defendants), and (c) in the event of a termination of the License Agreement prior to the end of its term, Licensee and the Guarantors agreed to pay Liquidated Damages to Plaintiff. Likewise, no party disputes that Licensee and the Guarantors have breached the License Agreement and the Guaranty, respectively, by failing to pay the accounts receivable (Recurring Fees) and Liquidated Damages due Plaintiff under the License Agreement. Finally, no party contests that Plaintiff has suffered damages.

Licensee and the Guarantors argue that there is a genuine issue of material fact as to their liability for such breaches. Licensee and the Guarantors contend that when Plaintiff began accepting checks from Lenawee Hotel in January 2004, Plaintiff knew or should have known of the ownership change at that time. Even if the Court were to accept that argument as true, however, Section 9.1 of the License Agreement is explicit: "Except as permitted by this Agreement, you and your owners may, **only with our prior written consent** and after you comply with Sections 9.3 and 9.6, assign, pledge, transfer, delegate or grant a security interest in all or any of your rights, benefits and obligations under this Agreement, as security or otherwise" (emphasis added). In this case, it is undisputed that Plaintiff did not give prior written consent to the Sale. In fact, it is undisputed that, prior to the Sale, Licensee (and the Guarantors) never notified Plaintiff of the Sale or sought Plaintiff's consent to transfer Licensee's rights under the License Agreement to the Kalabat Defendants. Thus, there is no genuine issue of material fact that Licensee and the Guarantors breached their respective agreements in July 2003, at least five months before they allege Plaintiff

10

even had constructive notice of the Sale.   Moreover, pursuant to Section 9.5 of the Agreement, the transfer of the Facility did not relieve Licensee or the Guarantors of their obligations under the License Agreement or the Guaranty:

> Any transaction requiring our consent under this Section 9 in which our consent is not first obtained shall be void, as between you and us. You will continue to be liable for payment and performance of your obligations under this Agreement until we terminate this Agreement, all your financial obligations to us are paid and all System identification is removed from the Facility.

Licensee and the Guarantors contend that they reasonably believed Plaintiff was relieving them of their obligations under the License Agreement and Guaranty because Plaintiff accepted the checks from Lenawee Hotel from January 2004 to November 2005.   Their argument ignores the express clause in the License Agreement (which is incorporated into the Guaranty), however, that provides (emphasis added):

> 17.2 Waivers, Modifications and Approvals. ... Our silence or inaction will not be or establish a waiver, consent, course of dealing, implied modification or estoppel.  **All modifications, waivers, approvals and consents of or under this Agreement must be in writing and signed by our authorized representative to be effective**.

That clause was part of the bargained-for agreement between business persons and it is enforceable. *See, e.g., Little Caesar Enter., Inc. v. R-J-L Foods, Inc.*, 796 F.Supp. 1026, 1032 (E.D. Mich. 1992) (non-waiver clause in a franchise agreement destroys any waiver or estoppel argument); *Burger King Corp. v. Hinton, Inc.*, 203 F.Supp.2d 1357, 1365 (S.D. Fla. 2002) ("The inclusion of a non-waiver clause in the Franchise Agreements precludes Defendants' defenses of waiver and estoppel"). In this case, there is no evidence, or even any contention, that Plaintiff gave a written waiver with respect to any obligation(s) of Licensee or the Guarantors.

11

The Court also concludes that there is no evidence that Plaintiff knew or had reason to know of the Sale until long after Licensee and the Guarantors breached their respective agreements.  It is undisputed that none of the parties notified Plaintiff of the Sale in 2003, 2004 or 2005.  In fact, to the extent Defendants acted at all, they essentially concealed the Sale during that time.  Even though Lenawee Hotel made the payments, neither Licensee nor Lenawee Hotel ever represented to Plaintiff that Lenawee Hotel was the owner of the Facility.  Instead, the site number for Licensee was put on each check from Lenawee Hotel and most of the checks were signed by Defendant Matt Karmo, a member of Licensee.  Moreover, Licensee signed addendums to the License Agreement in January 2004 and December 2004, each of which indicated Licensee was still the owner of the Facility.  In addition, when Plaintiff sent notice of breach of contract letters to Licensee at Licensee's principal contact address in January 2006 and June 2006, neither Licensee, the Guarantors nor any of the Kalabat Defendants notified Plaintiff that the Sale had occurred.  Further, when Plaintiff sent a breach of contract letter to Licensee at the Facility address in November 2006, no one informed Plaintiff of the Sale or that Lenawee Hotel was the party operating the Facility while using the Days Inn Marks.  As such, the fact that Lenawee wrote checks for the Facility would not have given Plaintiff reason to think that Lenawee Hotel (and not Licensee) owned the Facility.

Licensee and the Guarantors also contend that Plaintiff had an obligation to demand that any transfer be documented and that Plaintiff's failure to make such a demand is further evidence of Plaintiff's waiver of the requirements of the License Agreement regarding transfer of ownership. The cases Licensee and the Guarantors rely on, however, are inapposite to the facts of this case because in each of those cases, unlike in this case, the waiving party had knowledge of the breach. *See AccuSoft Corp. v. Palo*, 237 F.3d 31 (1st Cir. 2001) (willingness to continue honoring the

contract, despite knowledge that other party has failed to perform may constitute a waiver); *In re Landmark Holding Co., Ltd.*, 286 B.R. 377 (Bankr. D. Minn. 2002) (continued recognition of contract as binding after the other party's alleged breach acts as a waiver of that breach); *Austin v. Pickett*, 87 S.W.3d 343 (Mo. Ct. App. W.D. 2002) (a party may waive a breach of contract by the other party by words or conduct).

Licensee and the Guarantors also argue that "anything that induces the other party to perform an agreement after a default, or which shows that the agreement subsists after a default, amounts to a waiver." *Schnepf v. Thomas L. McNamara, Inc.*, 354 Mich. 393, 397 (1958). Licensee and the Guarantors further argue that the intent to effect a waiver of a breach of contract may be shown by indirect evidence if the actions are intended to induce the other party's detrimental reliance. *Communications Trans., Inc. v. TriStar Comm., Inc.*, 798 F.Supp. 406, 410-11 (W.D. Tex. 1992). In this case, however, Licensee admits it was negotiating with the Kalabat Defendants to have the Kalabat Defendants own and operate the Facility no later than July 24, 2003, at least five months before Plaintiff even received the first check from Lenawee Hotel. As such, Plaintiff's actions could not have induced Licensee and the Kalabat Defendants to enter into the Sale or caused the Corporate Kalabat Defendants to operate the Facility as a Days Inn hotel without a license.

Finally, the Court finds as a matter of law that, even accepting as true the contention that Defendant Karmo told one or more of Plaintiff's on-site inspectors in September 2006 that ownership of the Facility had changed, Plaintiff did not waive the obligations of Licensee and/or the Guarantors, nor did Licensee or the Guarantors have reason to believe Plaintiff was doing so. This alleged communication was not in writing, as required by Section 17.2 of the License Agreement.

As such, Licensee and the Guarantors remained obligated to perform under the License Agreement and Guaranty, respectively.

For the reasons set forth above, the Court finds no genuine issue of material fact that Licensee and the Guarantors breached their respective contracts with Plaintiff. More specifically, the Court finds as a matter of law that Licensee breached the License Agreement by failing to notify Plaintiff of the Sale and change of ownership of the Facility. The Court also finds as a matter of law that neither the Lenawee Hotel, which operated the Facility after the Sale, nor any of the Kalabat Defendants entered into a new license agreement with Plaintiff. As the License Agreement clearly and unambiguously provides that Licensee is obligated pay the Recurring Fees due pursuant to Sections 9, 9.5 and 13.2 in the event of a sale to a third-party who does not enter into a license with Plaintiff, the Court concludes that there is no issue of material fact that Licensee owes Plaintiff all Recurring Fees due from July 24, 2003 to June 1, 2007, when Plaintiff terminated the License Agreement.

In addition, because the License Agreement was terminated prior to its expiration as a result of Licensee's multitude of breaches, there is no genuine issue of material fact that Licensee owes Plaintiff Liquidated Damages as provided for in Sections 12.1 and 18.7 of the License Agreement. Finally, as (1) Licensee has not paid the outstanding Recurring Fees or the Liquidated Damages, and (2) the Guaranty clearly and unambiguously provides that the Guarantors shall make such payments in the event Licensee does not do so, the Court concludes there is no genuine issue of material that the Guarantors are jointly and severally liable for the outstanding Recurring Fees and the Liquidated Damages.

14

Accordingly, for the reasons set forth above, the Court grants Plaintiff's motion for summary judgment with respect to Counts I, II and VI of the First Amended Complaint.

**B.     Corporate Kalabat Defendants Have Violated the Lanham Act**

In Count VII of the First Amended Complaint, Plaintiff alleges that the Kalabat Defendants violated three sections of the Lanham Act.  The Court, as the parties have done, will analyze the Lanham Act violations with respect to the Corporate Kalabat Defendants separately from Jamal Kalabat ("Mr. Kalabat").  There is no dispute that: (1) Licensee sold the Facility to the Corporate Kalabat Defendants in 2003, without Plaintiff's prior written consent to any transfer of the License Agreement, (2) the Facility continued to operate under the Days Inns Marks until the Fall of 2007, and (3) the Kalabat Defendants willfully used the Days Inn Marks without any license to do so (*i.e.*, the License Agreement was not transferred to the Corporate Kalabat Defendants and the Corporate Kalabat Defendants did not enter into a new license agreement with Plaintiff to use the Days Inn Marks).  Moreover, the Kalabat Defendants do not contest that Plaintiff has established each element of the Lanham Act claims *vis a vis* the Corporate Kalabat Defendants.

**1.     15 U.S.C. §§ 1114 and 1125(a)**

To establish liability for trademark infringement under 15 U.S.C. § 1114, a plaintiff must show that: (1) it owns a valid, protectable trademark, (2) the defendant used the mark in commerce and without the registrant's consent, and (3) there was a likelihood of consumer confusion. *Too, Inc. v. The TJX Corp.*, 229 F. Supp. 825, 829 (S.D. Ohio 2002). To establish liability for unfair competition under 15 U.S.C. § 1125(a), a plaintiff must establish: (a) the false designation has a substantial effect on interstate commerce, and (b) the false designation creates a likelihood of confusion. *Johnson v. Jones*, 149 F.3d 494, 502 (6th Cir. 1998). The factors for determining

15

likelihood of confusion for a claim under Section 1125(a) are identical to those for a trademark infringement claim under Section 1114. *Interactive Prods. Corp. v. a2z Mobile Office Sols., Inc.*, 195 F. Supp. 2d 1024, 1030 (S.D. Ohio 2001).

(a)     *Plaintiff Has A Valid And Protectable Trademark*

There is no genuine issue of material fact that Plaintiff owns a valid and protectable trademark. All the Days Inn Marks used by the Corporate Kalabat Defendants while operating the Facility between 2003 and 2007 were registered on the principal register of the United States Patent and Trademark Office. Such registration is *prima facie* evidence that Plaintiff owns the marks and has an exclusive right to their use. *See* 15 U.S.C. § 1115(a); *DAP Prods., Inc. v. Color Tile Mfg., Inc.*, 821 F. Supp. 488, 491 (S.D. Ohio 1993).

(b)     *Days Inns Marks Used In Commerce Without A License or Consent From Plaintiff*

The record is undisputed that the Corporate Kalabat Defendants used the Days Inns Marks in commerce from July 24, 2003 (the date of the Sale) to October 16, 2007 (the confirmed de-identification date). It is undisputed that the Corporate Kalabat Defendants did not assume the License Agreement, and it is undisputed that the Corporate Kalabat Defendants never applied for or received a license (or any other form of consent) from Plaintiff to use the Days Inns Marks during that period. There also is no genuine issue of material fact that the Corporate Kalabat Defendants' unauthorized use of Days Inn Marks for over four years had a substantial effect on commerce.

(c)     *Unauthorized Use of Days Inns Marks Leads to Likelihood Of Consumer Confusion*

The Sixth Circuit uses an eight-factor test to ascertain whether a likelihood of confusion exists: (1) strength of the senior mark; (2) relatedness of the services; (3) similarity of the marks; (4) evidence of actual confusion; (5) marketing channels used; (6) likely degree of purchaser care;

16

(7) the intent of defendant in selecting the mark; and (8) likelihood of expansion of the product lines. *Frisch's Rests., Inc. v. Shoney's Inc.*, 759 F.2d 1261, 1264 (6th Cir. 1985). "These factors imply no mathematical precision, and a plaintiff need not show that all, or even most, of the factors listed are present in any particular case to be successful." *OmniAmerica Group v. Street Gold Records, Ltd.*, 916 F. Supp. 672, 677 (N.D. Ohio 1996). The Court finds that virtually all of those factors are present in this case.

First, the Days Inns Marks have been registered on the principal register of the United States Patent and Trademark Office for well over five years. Therefore, "the mark must be considered strong and worthy of full protection." *Wynn Oil Co. v. Am. Way Serv. Corp.*, 943 F.2d 595, 600 (6th Cir. 1991). Second, the relatedness of the services is significant because the Corporate Kalabat Defendants offered the same services as other, legitimate Plaintiff franchisees. In evaluating the relatedness of the goods or services, the court in *Wynn Oil* noted that a court must bear in mind that it is trying to determine whether consumers will be confused as to the origin or sponsorship of the goods or services. *Id.* In the present case, there can be no genuine issue of material fact that consumers were misled to believe that Plaintiff was the sponsor of the Corporate Kalabat Defendants' guest lodging services, even though no franchise relationship existed between Plaintiff and the Corporate Kalabat Defendants.

Third, the Days Inn Marks utilized by the Corporate Kalabat Defendants were not just similar to the Days Inns Marks, they were identical, and proof of actual confusion is not required when there is strong evidence of actual copying of a plaintiff's trademarks. *DAP Prods.*, 821 F. Supp. at 493. In such instances, a likelihood of confusion is presumed because no matter what degree of care is exercised, consumers are unlikely to be able to determine that Plaintiff was not the sponsor of the

17

Facility. *Id.*; *Wynn Oil*, 943 F.2d at 602 (noting that the defendant's merchandising efforts are predicated upon an ignorant and easily confused consumer). In this case, because the marks were identical, there is no genuine issue of material fact that consumers would be unable to discern that the Corporate Kalabat Defendants were not operating a legitimate and authorized Days Inn facility.

Fourth, the circumstances of the Sale demonstrate that the Corporate Kalabat Defendants intentionally infringed on Plaintiff's service marks and trade name. "Although intentional infringement is not necessary for a finding of likely confusion, the presence of that factor strengthens the likelihood of confusion." *Wynn Oil*, 943 F.2d at 602. In this case, the Court may infer an intent to deceive the public because the Corporate Kalabat Defendants used a mark identical to the trademark in issue. *Id.* at 603. Fifth, none of the Kalabat Defendants opposed Plaintiff's motion for a preliminary injunction. Instead, the Kalabat Defendants entered into a Stipulated Injunction acknowledging that they had no right to use the Days Inns Marks and agreeing to de-identify the Facility. Accordingly, the Court concludes that there was a substantial likelihood of consumer confusion as a result of the Corporate Kalabat Defendants' unauthorized use of the protected Marks.

    *(d)*    *Conclusion*

For the reasons stated, the Court concludes that there is no genuine issue of material fact as to each of the three elements of a § 1114 trademark infringement claim and the two elements of an unfair competition claim under § 1125(a).

    **2.**    **Trademark Dilution Under 15 U.S.C. § 1125(c)**

Dilution law, unlike trademark infringement, is not based on a likelihood of confusion standard, "but only exists to protect the quasi-property rights a holder has in maintaining the

18

integrity and distinctiveness of his mark." *Kellogg Co. v. Toucan Golf, Inc.*, 337 F.3d 616, 628 (6th Cir. 2003). To establish trademark dilution under 15 U.S.C. § 1125(c), Plaintiff must show: (1) the senior mark is famous; (2) the senior mark is distinctive; (3) the junior mark must be a commercial use in commerce; (4) the junior mark must have begun subsequent to the senior mark becoming famous; and (5) the junior mark caused dilution of the distinctive quality of the senior mark. *See, e.g.*, *Autozone, Inc. v. Tandy Corp.*, 373 F.3d 786, 802 (6th Cir. 2004).

The first four elements cannot be seriously disputed, as the Days Inns Marks are famous and distinctive, and the Days Inns Marks were famous before the Corporate Kalabat Defendants began using them in commerce.  As to the fifth element, the U.S. Supreme Court has noted that "direct evidence of dilution . . . will not be necessary if actual dilution can reliably be proven through circumstantial evidence-the obvious case is one where the junior and senior marks are identical." *Moseley v. V Secret Catalogue, Inc.*, 537 U.S. 418, 434 (2003).  As the marks used by the Corporate Kalabat Defendants and the Days Inns Marks are identical, no genuine issue of material fact exists as to the fifth element. Thus, there is no genuine issue of material fact with respect to any of the elements of Plaintiff's trademark dilution claim under 15 U.S.C. § 1125(c).

### 3. No Summary Judgment on Lanham Act Claims Against Mr. Kalabat

Plaintiff's motion for summary judgment on the Lanham Act claims is also asserted against Mr. Kalabat.  It is well-established law that employees and corporate officers can be held individually liable under the Lanham Act when the employee or corporate officer personally takes part in the infringing activity or directs others to do so. *See, e.g.*, *Two Men & a Truck/Int'l, Inc. v. Two Men & a Truck/Kalamazoo*, No. 5:94-CV-162, 1995 U.S. Dist. LEXIS 11295, at *4 (W.D. Mich. July 24, 1995) ("Employees of corporations are not shielded from individual liability under

19

the Lanham Act solely because their actions were taken within the scope of their Employment")
(*citing Donsco, Inc. v. Casper Corp.*, 587 F.2d 602, 606 (3d Cir. 1978)).  *See also Babit Elec., Inc.
v. Dynascan Corp.*, 38 F.3d 1161, 1184 (11th Cir. 1994) (corporate officer who directs, controls,
ratifies, participates in, or is moving force behind infringing activity is personally liable for
trademark infringement without regard to piercing of corporate veil); *Hair Assocs. v. Nat'l Hair
Replacement Servs.*, 987 F. Supp. 569, 590-91 (W.D. Mich. 1997) (a corporate officer's active
participation in infringing activity is sufficient to subject him to joint and several liability for
trademark infringement with the corporation); J. Thomas McCarthy, *McCarthy on Trademarks and
Unfair Competition* § 25:24 (4th ed. 2005).  Significantly, however, none of the foregoing cases
stand for the proposition that a plaintiff is entitled to summary judgment on a Lanham Act claim.

Officers of a corporation also may be found liable for trademark infringement if there is
"found some active or passive participation in such wrongful conduct . . . ." *U.S. v. Beneficial Real
Estate Co.*, No. 77-72729, 1980 U.S. Dist. LEXIS 9495, at *7 (E.D. Mich. 1980) (*quoting
Hagemeyer Chem. Co. v. Insect-O-Lite Co.*, 291 F.2d 696 (6th Cir. 1961)). Even a lack of
participation in the infringement will not insulate a corporate officer from liability where he had "the
right and ability to supervise the infringing activity and also had a direct financial interest in such
activities." *Id.* (*quoting L & L While Metal Casting Corp. v. Cornell Metal Specialties Corp.*, 353
F. Supp. 1170, 1175 (E.D.N.Y. 1972)); *Gershwin Publ'g Corp. v. Columbia Artists Mgmt., Inc.*, 443
F.2d 1159, 1162 (2d Cir. 1971).

In this case, it is undisputed that: (1) Mr. Kalabat signed the papers to transfer ownership of
the Facility from Licensee to him as the agent "on behalf of a corporation to be formed," (2) Mr.

20

Kalabat was the President of Lenawee Hotel and signed several of the checks Lenawee Hotel sent

to Plaintiff, (3) Mr. Kalabat was one of only two shareholders/members of both Lenawee Hotel and

Adrian Properties, and (4) Mr. Kalabat is the resident agent for Lenawee Hotel.  Mr. Kalabat,

however, has submitted an affidavit that states, among other things, that he: (a) never personally

owned or operated the Facility (as he simply was part owner of the corporate entity which owned

the Facility), (b) a third party was paid to facilitate unresolved business pertaining to the Purchase

Agreement and the transition of the Facility, including the transfer of the License Agreement,

transfer of the liquor license, and handling the existing insurance claim, and (c) a third party was

paid to handle day-to-day operations of the Facility.  Mr. Kalabat also states that he was aware that

the checks from the Lenawee Hotel were being cashed by Plaintiffs, without objection.

For these reasons, and viewing the evidence in a light most favorable to Mr. Kalabat (the

non-moving party), the Court must conclude that there is a genuine issue of material fact whether

Mr. Kalabat had the right and ability to supervise the infringing activity and/or participated in that

activity such that Mr. Kalabat is personally liable to Plaintiff under the Lanham Act for the

unauthorized use of the Days Inn Marks.  Accordingly, Plaintiff's motion for summary judgment

on the Lanham Act claims is denied as to Mr. Kalabat.

### 4. Equitable Defenses[3]

---

[3]At this time, the Court's analysis regarding the clean hands doctrine, and the Court's
conclusion that such doctrine operates as a bar to the assertion of equitable defenses asserted by
the Kalabat Defendants, are limited to the Corporate Kalabat Defendants.  The Court's analysis
and conclusion regarding the merits of the equitable defenses asserted by the Kalabat
Defendants, however, is applicable to all of the Kalabat Defendants (*i.e.*, such defenses are not
available to any of the Kalabat Defendants).

The Kalabat Defendants contend that Plaintiff's Lanham Act claims are barred under the equitable defenses of laches, acquiescence and/or equitable estoppel. The Court concludes otherwise, however, for several reasons. First, the Corporate Kalabat Defendants come before the Court with "unclean hands." To have unclean hands, "one's misconduct need not necessarily have been of such a nature as to be punishable as a crime or as to justify legal proceedings of any character. Any willful act concerning the cause of action which rightfully can be said to transgress equitable standards of conduct is sufficient cause for the invocation of the maxim" by the Court. *Stachnik v. Winkel*, 394 Mich. 375, 386 (1975) (*quoting Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*, 324 U.S. 806, 815 (1944)).

It is well-settled law that a party must have clean hands to invoke an equitable defense.[4] *See, e.g., Toyota Jidosha Kabushiki Kaisha v. Aliments Lexus, Inc.*, No. CV-02-0013, 2004 U.S. Dist. LEXIS 10729, at *25 (E.D.N.Y. June 14, 2004) ("party asserting acquiescence or laches as a defense must . . . have clean hands"); *Trombley v. Capac State Savings Bank*, No. 187367, 1997 Mich. App. LEXIS 532, at *7 (Mich. Ct. App. Feb. 4, 1997) ("[o]ne who seeks equity must first offer to do equity, and since laches is an equitable doctrine, a defendant with unclean hands may not assert the defense"); *Nat'l Baseball Hall of Fame and Museum, Inc. v. All Sports Promotions, Inc.*, 2001 U.S. Dist. LEXIS 1592, at *33-34 (S.D.N.Y. Feb. 20, 2001) (no summary judgment on acquiescence defense in infringement case due to unclean hands).

In this case, it is undisputed that the Corporate Kalabat Defendants intentionally and willfully infringed on the Days Inn Marks for four years, even doing so for more than 18 months without any

---

[4]Laches, acquiescence, and equitable estoppel are equitable defenses. *Audi AG v. D'Amato*, 381 F. Supp. 2d 644, 655 (E.D. Mich. 2005).

payments being made to Plaintiff. The fact that the Corporate Kalabat Defendants did so knowing that they did not have a license or right to use the Days Inn Marks only further demonstrates the willful nature of their misconduct. As the Corporate Kalabat Defendants have come to the Court in this action with unclean hands, they cannot rely on those equitable defenses to overcome Plaintiff's Lanham Act claims.

Second, even if the Corporate Kalabat Defendants had clean hands, the Court concludes that they cannot satisfy the elements of each of the identified equitable defenses. To establish laches, a defendant must show proof of: (1) unreasonable delay by plaintiff, and (2) material prejudice to the infringing defendant. *See, e.g., Bliss Clearing Niagara, Inc. v. Midwest Brake Bond Co.*, 339 F.Supp.2d 944, 961 (W.D. Mich. 2004). If an action is brought within three years after actual or constructive knowledge of the infringement, any delay is considered presumptively reasonable. *Nartron Corp. v. STMicroelectronics, Inc.*, 305 F.3d 397, 508 (6th Cir. 2002).

In this case, Plaintiff did not have actual knowledge of infringement and a duty to act until July 2007 (after filing suit against the Karmo Defendants), when Plaintiff was given written notice of the infringement. Even if the verbal communication from Defendant Karmo to one of Plaintiff's inspectors is deemed actual knowledge, such communication was not made for the first time until September 2006. In either event, Plaintiff filed its action against the Kalabat Defendants approximately one year later, which is not an unreasonable delay. In addition, the Kalabat Defendants have alleged only economic prejudice as a result of the delay, with such prejudice being in the form of additional damages and defense costs. Such damages, however, are directly linked to the Corporate Kalabat Defendants' decision to continue infringing on the Days Inn Marks. Therefore, to the extent there is any prejudice, it is the result of their own actions.

23

Acquiescence not only requires proof of both elements of laches (which the Kalabat Defendants cannot satisfy), it also requires satisfaction of the additional element of active consent to the infringement. *See, e.g., Elvis Presley Enters., Inc. v. Elvisly Yours, Inc.*, 936 F.2d 889, 894 (6th Cir. 1991) (acquiescence requires a finding of conduct on plaintiff's part that amounts to an assurance); *Review Directories Inc. v. McLeodUSA Publ'g Co.*, 2001 U.S. Dist. LEXIS 10744, at *4 (W.D. Mich. July 23, 2001) ("Acquiescence requires a defendant to prove that the plaintiff actively consented to the infringing use of its trademark."). In this case, there is no evidence that Plaintiff ever communicated with the Kalabat Defendants at any time prior to sending them a cease and desist letter in September 2007. Accordingly, the Court concludes as a matter of law that Plaintiff did not actively consent to the infringing use of its trademark, thereby eviscerating the affirmative defense of acquiescence.

Finally, in order to establish an equitable estoppel defense, the Kalabat Defendants would have to "show either misrepresentations, affirmative acts of misconduct, or intentionally misleading silence" by Plaintiff that would amount to "bad faith" and would lead the Kalabat Defendants "to do what they would not otherwise have done." *See TWM Mfg. Co. Inc. v. Dura Corp.*, 592 F.2d 346, 350 (6th Cir. 1979); *Dana Corp. v. IPC, Ltd. Partshp.,* 674 F.Supp. 581, 584 (E.D. Mich. 1987); *Birch Forest Club v. Rose*, 23 Mich.App. 492, 498 (1970). First, as the Corporate Kalabat Defendants completed the Sale and used the Days Inn Marks for at least five months before they even made a payment to Plaintiff (and it is undisputed Plaintiff had no idea about the Sale during that period), there is no conduct of Plaintiff which could have led to the Corporate Kalabat Defendants doing something (such as infringe on Plaintiff's Days Inn Marks) that they would not otherwise have done. Second, the Kalabat Defendants have offered no evidence that would show

24

any action of or silence by Plaintiff rose to the level of bad faith. Accordingly, the Court concludes as a matter of law that the Corporate Kalabat Defendants may not rely on an equitable estoppel defense in this case.

>        **5.        Conclusion**

For the reasons set forth above, the Court concludes: (1) Plaintiff is entitled to, and the Court hereby grants Plaintiff's motion for, summary judgment against the Corporate Kalabat Defendants on Plaintiff's Lanham Act claims pursuant to 15 U.S.C. §§ 1114, 1125(a) and 1125(c), and (2) Plaintiff is not entitled to summary judgment on its Lanham Act claims against Mr. Kalabat, and the Court therefore denies Plaintiff's motion for summary judgment against Mr. Kalabat.

**C.    Plaintiff's Damages**

>        **1.        Plaintiff Has Suffered Breach of Contract Damages**

As set forth above, the Court has found as a matter of law that Licensee and the Guarantors have breached the terms of the License Agreement and Guaranty. Plaintiff also contends that there is no genuine issue of material fact and seeks judgment with respect to amounts due Plaintiff under those agreements for: (1) the accounts receivable for Recurring Fees, (2) Liquidated Damages, and (3) attorneys' fees.

Licensee and the Guarantors argue that Plaintiff waived its right to hold them liable for unpaid Recurring Fees and Liquidated Damages. This argument fails for the same reasons discussed in Section IV.A. above (*i.e.*, Plaintiff never provided them with a written waiver as required by Section 17.2 of the License Agreement). Alternatively, they argue that Plaintiff's damages should be limited for failure to mitigate because Plaintiff did not refuse to accept payments from Lenawee Hotel, terminate the License Agreement and seek payment of liquidated damages. This argument

is equally unavailing as Plaintiff had no notice of the Sale and no notice that the Corporate Kalabat Defendants (and not Licensee) owned and operated using the Days Inn Marks for the Facility until July 2007, after Plaintiff initiated this lawsuit in New Jersey.

        *(a)     Accounts Receivable for Recurring Fees*

As set forth in the uncontested affidavit submitted by Valerie Capers Workman ("Ms. Workman"), Plaintiff's Vice President for Finance Administration, the outstanding principal amount of accounts receivable for the Facility is $89,988.15.  Interest has accrued and continues to accrue on such amount at the rate of 1.5% per month (which is $41.41 *per diem* on an annualized basis). As none of the Defendants have contested the calculations by Ms. Workman, the Court finds that there is no genuine issue of material fact that Plaintiff is entitled to damages for accounts receivable in the principal amount of $89,988.15, plus interest on such amount at the rate of 1.5% per month. Licensee and the Guarantors are jointly and severally liable for payment of all outstanding accounts receivable principal, as well as all interest which has accrued and will accrue, under the terms of their respective agreements.

        *(b)     Liquidated Damages*

New Jersey law favors liquidated damages provisions. *D.H.M. Indus., Inc. v. Central Port Warehouses, Inc*., 318 A.2d 20, 23 (N.J. App. Div. 1973), *aff'd*, 318 A.2d 19 (1974). Liquidated damages clauses between commercial parties, as here, are presumptively valid, and the burden is on the party opposing enforcement of the clause to demonstrate otherwise. *Cent. Steel Drum Co. v. Gold Cooperage, Inc.*, 491 A.2d 49, 57 (N.J. App. Div. 1985), *cert. denied*, 101 N.J. 303 (1985), *overruled on other grounds*, *Kutzin v. Pirnie*, 591 A.2d 932 (N.J. 1991).  Whether a liquidated damages clause is valid and enforceable is a question of law for the court, not a question of fact for

26

the jury. *Naporano Assocs., L.P. v. B&P Builders*, 706 A.2d 1123, 1127 (N.J. App. Div. 1998). Courts have enforced liquidated damages clauses substantially similar to the clause at issue. *See, e.g.*, *Ramada Franchise Sys., Inc. v. Hanna Hotel Enter.*, 147 F. Supp.2d 840, 848-49 (N.D. Ohio 2001) (applying New Jersey law); *Days Inn of America, Inc. v. Patel,* 88 F.Supp.2d 928 (D.Ill. 2000) (same; enforcing liquidated damages of $120,000).

In the present case, the Liquidated Damages provision of the License Agreement is presumptively valid because the parties negotiated this provision. *See Central Steel*, 200 N.J. Super at 265. As the actual damages for breach of the License Agreement are impossible or very difficult to estimate given the nature of the transient lodging business, Plaintiff argues that it is entitled to Liquidated Damages. Licensee and the Guarantors do not dispute that Plaintiff is entitled to Liquidated Damages in the event the Court concludes that Licensee and the Guarantors breached the License Agreement and Guaranty, respectively. For these reasons, the Court concludes that, as a matter of law, Plaintiff is entitled to Liquidated Damages.

The Liquidated Damages for the premature termination of the License Agreement are calculated pursuant to the formula specified in Sections 12.1 and 18.7 of the License Agreement. Under this formula, liquidated damages are not to exceed $1,000 per room. As set forth in the uncontested affidavit submitted by Ms. Workman, Licensee was utilizing 77 rooms at the Facility. For the reasons set forth above (in particular the willful manner in which Licensee failed to disclose the Sale to Plaintiff), the Court concludes that Plaintiff is entitled to $1,000 per utilized room (*i.e.* $77,000) as Liquidated Damages. Licensee and the Guarantors are jointly and severally liable for such Liquidated Damages under the terms of their respective agreements.

**2.     Lanham Act Damages**

Damages recoverable for violations of 15 U.S.C. §§ 1114, 1125(a) and 1125(c) are governed by 15 U.S.C. § 1117(a). Section 1117(a) provides, in part, that "the plaintiff shall be entitled . . . to recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action." Section 1117(a) also provides that "the court may enter judgment, according to the circumstances of the case, for any sum above the amount found as actual damages, not exceeding three times such amount." Courts frequently award treble damages where the infringer acted willfully or where the court wishes to deter future infringing activity. *See*, *e.g., Powerhouse Marks LLC v. Chi Hsin Impex, Inc.*, 463 F. Supp. 2d 733, 738 (E.D. Mich. 2006). In similar cases, federal courts have found a franchisor's lost fees to be a proper measure of Lanham Act damages. *See Ramada Inns, Inc. v. Gadsden Motel Co.*, 804 F.2d 1562, 1565 (11th Cir. 1986) (award based on franchise fees or royalties lost during infringement period was "entirely proper"); *see also Sands, Taylor & Wood v. Quaker Oats Co.*, 34 F.3d 1340, 1344-45 (7th Cir. 1994) (same), *aff'd in part by* 34 F.3d 1340 (7th Cir. 1994). *See also Mid-Michigan Computer Sys., Inc. v. Marc Glassman, Inc.*, 416 F.3d 505 (6th Cir. 2005) (hypothetical royalty fee is proper measure).

In this case, Plaintiff proposes, and the Kalabat Defendants have not objected to, using the loss of franchise fees as the measure of Lanham Act damages. The loss of franchise fees means the amount of customary fees to which Plaintiff would have been entitled for use of the Days Inn Marks under the License Agreement, as measured from the date of the Sale (July 24, 2003) until de-identification on October 16, 2007 (*i.e.*, the Recurring Fees). The Court hereby adopts this method of calculating Lanham Act damages for this case. Accordingly, the Lanham Act damages are: (1) $115,210.78 for the accounts receivable (principal and interest accrued during the term of the License Agreement, *i.e.*, up to June 1, 2007), plus (2) $13,544.28 for post-termination use of the

Marks (*i.e.* use from June 1, 2007 through October 16, 2007), as calculated in the unopposed affidavit of Ms. Workman.  Thus, adding those figures together, the Lanham Act infringement damages total $128,755.06.[5]

Under Sixth Circuit authority, this Court may award Plaintiff up to $515,020.24 under the Lanham Act. *See U.S. Structures, Inc. v. J.P. Structures, Inc.*, 130 F.3d 1185, 1192 (6th Cir. 1997) ("Section 1117(a) provides that 'the court may enter judgment, according to the circumstances of the case, for any sum above the amount found as actual damages, not exceeding three times such amount.' This section should be read as vesting the district court with discretion to increase a damages award up to three times the actual damages sustained. Thus, the district court did not err in computing damages as an amount equal to four times actual damages.").

The Court concludes that, in addition to the Lanham Act damages discussed above, it is necessary and appropriate to award treble damages in this case because the Corporate Kalabat Defendants acted intentionally and/or intentionally used a counterfeit mark. A "counterfeit mark" is a "spurious mark which is identical with, or substantially indistinguishable from, a registered mark." 15 U.S.C. § 1127; 15 U.S.C. § 1117(b) (treble damages for counterfeit mark); *see also Babbit Elec.*, 38 F.3d at 1181.  Further, it is undisputed that the Corporate Kalabat Defendants knew that the Facility was not a Days Inns Facility when it used the Days Inns Marks.  Accordingly, the Court imposes treble damages for the intentional infringement of the Days Inn Marks by the Corporate Kalabat Defendants.  As a result, the Court awards treble damages of $386,265.18 to be paid by the

---

[5] Again, if Plaintiff recovers some or all of the accounts receivable from Licensee and/or the Guarantors, then Plaintiff shall credit that recovery against the infringement damages due from the Kalabat Defendants.

Corporate Kalabat Defendants, which sum is in addition to the $128,755.06 infringement damages discussed above.

### 3.    Attorneys' Fees and Costs

Plaintiff is entitled to recover its attorneys' fees under the breach of contract and the Lanham Act claims.  First, under New Jersey law, in a breach of contract action, legal expenses can be recovered if the contract between the parties so provides. *Papalaxiou v. Tower West Condo.*, 401 A.2d 280, 287-88 (N.J. Super.Ch. 1979).  In this case, Section 17.4 of the License Agreement provides for the recovery of legal expenses incurred by the prevailing party to enforce the License Agreement or collect amounts due thereunder.  Accordingly, the Court concludes Plaintiff is entitled to, and Licensee and the Guarantors are liable for, attorneys' fees and costs incurred by Plaintiff to enforce the License Agreement.

Second, the Kalabat Defendants must pay attorneys' fees to Plaintiff because this case is an "exceptional one." *See* 15 U.S.C. § 1117(d); *Wynn Oil*, 943 F.2d at 607 ("exceptional cases" are "those cases in which the infringement was malicious, willful, fraudulent, or deliberate.").  As discussed above, the Corporate Kalabat Defendants willfully and deliberately used the Days Inns Marks without authorization for more than four years and they, together with Licensee, caused Plaintiff to believe that there had been no change in ownership requiring a new license agreement. Such malice is further evidenced by the Corporate Kalabat Defendants' continued use of the Days Inns Marks even when no one was making payments to Plaintiff.  Finally, the Corporate Kalabat Defendants' infringing use of the Days Inn Marks ceased only after Plaintiff moved for a preliminary injunction. Thus, the Court finds that this is an exceptional case, and Plaintiff is entitled

to summary judgment on the issue of the Corporate Kalabat Defendants' attorneys' fees and costs pursuant to the Lanham Act.

At this time, the Court shall not make a finding as to the amount of attorneys' fees and costs owed by Licensee and the Guarantors or by the Corporate Kalabat Defendants. Instead, the Court shall make such a determination upon the conclusion of this action, after Plaintiff has provided the Court with a complete and detailed invoice as to its attorneys' fees and costs and how such fees and costs are to be allocated against the Defendants.

### V. KALABAT DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

The Kalabat Defendants Motion for Partial Summary Judgment seeks relief on three separate "complaints": (1) judgment in their favor and against Plaintiff with respect to Plaintiff's First Amended Complaint; (2) judgment in their favor and against the Karmo Defendants on the Cross-complaint filed by the Karmo Defendants; and (3) judgment in their favor with respect to the Cross-complaint filed by the Kalabat Defendants against the Karmo Defendants.

### A.   Plaintiff's First Amended Complaint

The Kalabat Defendants assert that they are entitled to judgment in their favor on Plaintiff's First Amended Complaint because: (1) Plaintiff's claims are barred by the doctrine of laches, (2) Plaintiff's claims are barred by the doctrine of acquiescence, (3) Plaintiff's claims are barred by the doctrine of equitable estoppel, and (4) the Kalabat Defendants were not unjustly enriched. As discussed in Section IV.B.4. above, the Court already has concluded that the Kalabat Defendants cannot rely on the doctrine of laches, the doctrine of acquiescence and the doctrine of equitable estoppel. As such, those arguments are futile.

31

As to Plaintiff's unjust enrichment claim, the Kalabat Defendants contend that "[t]here is no evidence that [the Kalabat Defendants] were unjustly enriched" because Lenawee Hotel paid Plaintiff at least $98,018.04. The Court finds this contention disingenuous. Simply put, the Corporate Kalabat Defendants operated the Facility utilizing the Days Inn Marks for over four years but only made payments (though not necessarily even what they would have owed if they had a valid license) for approximately two years. As such, there is, at a minimum, a genuine issue of material fact as to whether the Corporate Kalabat Defendants were unjustly enriched by utilizing Plaintiff's Days Inn Marks for over two years **without paying Plaintiff anything.** Accordingly, the Court denies the Kalabat Defendant's motion for summary judgment with respect to Plaintiff's First Amended Complaint.

**B.      Cross-Complaints**

The Karmo Defendants asserted cross-claims against the Kalabat Defendants for: (1) breach of contract, (2) unjust enrichment, and (3) common-law indemnification. The Kalabat Defendants asserted cross-claims against: (1) Licensee for breach of contract, (2) the Guarantors for contribution, and (3) all of the Karmo Defendants for indemnification.

**1.      Cross Claims for Breach of Contract**

The Karmo Defendants claim that the Kalabat Defendants breached the Agreement to Purchase dated June 9, 2003, and signed by Licensee (and Adrian Beverage Co., which held the liquor license) and Mr. Kalabat, on behalf of a corporation to be formed (the "Purchase Agreement"). The Karmo Defendants allege that the Kalabat Defendants breached the Purchase Agreement because they did not take all necessary steps to transfer the License Agreement.

32

Conversely, the Kalabat Defendants claim that Licensee breached the Purchase Agreement because Licensee failed to effectuate the transfer of the License Agreement.

Paragraph 12 of the Purchase Agreement states:

> 12.   <u>Closing Requirements; Contingencies:</u> Purchaser's [the Corporate Kalabat Defendants']⁶ obligation to purchase the Subject Property [the Facility] hereunder shall be subject to the following terms and conditions as of the Closing Date:
>
> \* \* \* \* \*
>
> This offer is contingent upon the following:
>
> \* \* \* \* \*
>
> f.   Seller [Licensee] being able to assign its Days Inn franchise agreement to Purchaser. Seller shall provide Purchaser with the results of inspections and lists prepared by Franchisor in relation to the transfer. Seller shall complete all necessary forms and documents and shall assist Purchaser in all respects in securing said transfer, including but not limited to paying any outstanding franchise fees.

On July 24, 2003, the parties executed the First Amendment, wherein they agreed:

> 2.   Purchaser agrees to waive all contingencies contained in the [Purchase] Agreement, as amended by Court Order, as of the date of Closing.

In reviewing the foregoing provisions, the Court cannot conclude, as the Kalabat Defendants have, that as a matter of law "[Licensee] was responsible to transfer the License Agreement [and that] [t]here is absolutely no evidence that the Kalabat Defendants breached the Purchase Agreement." For example, Paragraph 12(f) says that Licensee "**shall assist** Purchaser . . . in

---

⁶In the First Amendment to Agreement to Purchase dated July 24, 2003 (the "First Amendment"), the parties agreed that "Purchaser" meant Lenawee Hotel, Adrian Properties, and Adrian Restaurant & Bar, Inc. (for purpose of transferring the liquor license).

securing said transfer, ..."  As such, at a minimum, there is a genuine issue of material fact whether "[Licensee] shall assist Purchaser" means "Licensee was responsible to transfer" the License Agreement.  In addition, Paragraph 2 of the First Amendment clearly states that the Purchaser [Lenawee Hotel] waived all contingencies contained in the Purchase Agreement, although an Assignment executed the same day provides that Adrian Hotel would assign to the Kalabat Corporate Defendants all of "its right, title and interest in and to . . . [a]ll trademarks, trade names, trade styles, logos and other marks and trade or business names, relating to the ownership, use, operation and management of the Property[.]"  Thus, at least arguably, any obligation of Licensee with respect to a "transfer" or assignment of the Days Inn Marks under the Purchase Agreement was vitiated at the time the First Amendment was executed.  Further, it is undisputed that the Kalabat Defendants never contacted Plaintiff about obtaining a transfer of the License Agreement or obtaining their own license to use the Days Inn Marks.

For the foregoing reasons and viewing the evidence in a light most favorable to the Karmo Defendants (the non-moving party), the Court concludes that a genuine issue of material fact exists with respect to both: (a) the breach of contract claim asserted by the Karmo Defendants, and (b) the breach of contract claim asserted by the Kalabat Defendants.  Accordingly, the Court denies the Kalabat Defendants' motion for summary judgment with respect to the breach of contract claims in both the Karmo Defendants' Cross-complaint and the Kalabat Defendants' Cross-complaint.

### 2.    The Karmo Defendants' Unjust Enrichment Claim

In their Cross-complaint, the Karmo Defendants allege that the Kalabat Defendants will be unjustly enriched if: (a) the Karmo Defendants are compelled to pay Plaintiff fees in this lawsuit, which fees the Karmo Defendants believe are owed by the Kalabat Defendants, and (b) the Kalabat

34

Defendants were able to operate the Facility as a Days Inn hotel without remitting those fees to Plaintiff. The Kalabat Defendants contend that there is no evidence that they received or retained any benefit, but the Court concludes that there is a genuine issue of material fact whether the Kalabat Defendants received a benefit from operating the Facility for at least two years without paying any fees to Plaintiff, either directly or through the Karmo Defendants. Accordingly, the Court denies the Kalabat Defendants' motion for summary judgment on the Karmo Defendants' cross-claim for unjust enrichment.

### 3.     The Karmo Defendants' Common Law Indemnity Claim

The Karmo Defendants' Cross-complaint alleges that because the wrongful acts of the Kalabat Defendants "may result in liability of [the Karmo Defendants] to [Plaintiff,]" the Karmo Defendants are entitled to restitution from the Kalabat Defendants for any such liability incurred. The Kalabat Defendants argue that the Karmo Defendants are precluded from recovering on a common-law indemnity claim because the Karmo Defendants were not passive actors, *i.e.*, the Karmo Defendants' liability would not "arise[] vicariously or by operation of law from the acts of the party from whom indemnification is sought[.]" *Langley v. Harris Corp.*, 413 Mich. 592, 601 (1982). The Court agrees. In this case, to the extent that the Karmo Defendants are liable to Plaintiff, they are liable on breach of contract claims, which liability is based on the acts or omissions of the Karmo Defendants with respect to the License Agreement, not vicariously or by operation of law as the result of the actions of the Kalabat Defendants. Accordingly, the Court grants the Kalabat Defendants' motion for summary judgment with respect to the Karmo Defendants' cross-claim for common-law indemnification.

### 4.     The Kalabat Defendants' Contribution Claim

35

In their Motion for Summary Judgment on their cross-claims, the Kalabat Defendants list contribution as one of the cross-claims they asserted, but they make no argument as to why summary judgment should be granted on this cross-claim. Despite the absence of argument to justify summary judgment on the contribution claim, the Karmo Defendants responded that contribution is inapplicable in this case because Plaintiff has not sought joint and several liability against the Kalabat Defendants and the Karmo Defendants with respect to any claim or injury. *See* M.C.L. § 600.2925a(1) (contribution may be sought from anyone who is "jointly or severally liable in tort for the same injury . . ."). Despite filing a reply brief with respect to their Motion for Partial Summary Judgment, the Kalabat Defendants again failed to include any argument to support their request for summary judgment on its contribution cross-claim. As the Court concludes that the Kalabat Defendants have failed to satisfy their burden of demonstrating that they are entitled to summary judgment on the contribution cross-claim, and as applicable Michigan law does not allow for contribution under the circumstances of this case, the Court denies the Kalabat Defendants' motion for summary judgment on their contribution cross-claim.

### 5.    The Kalabat Defendants' Indemnity Claim

The Kalabat Defendants have included an indemnity claim in their Cross-complaint against the Karmo Defendants, however, they do not specify whether it arises out of the Purchase Agreement or if they are seeking relief based on common-law indemnification. In either event, the Court concludes that summary judgment is not justified.

Paragraph 15 of the Purchase Agreement provides:

> Seller [Licensee] shall unconditionally indemnify and hold harmless the Purchaser [Lenawee Hotel] against and in respect of any and all liabilities, . . . incurred by Purchaser by reason of[] (a) any claims . . ., or (b) all claims . . . hereunder or arising out of the operation of

36

the operation of the Subject Property to the date of closing and which
first arose prior to the date hereof or which are based upon fact in
existence prior to the date of closing . . .

Most, if not all, of the allegations set forth in Plaintiff's First Amended Complaint against the

Kalabat Defendants involve alleged wrongdoing by the Kalabat Defendants after the Sale.  Thus,

there is a genuine issue of material fact as to whether the Karmo Defendants would have an

obligation to contractually indemnify the Kalabat Defendants for any liability the Kalabat

Defendants would have to Plaintiff.

Moreover, any common-law indemnity claim asserted by the Kalabat Defendants must be

denied.  To the extent the Kalabat Defendants are liable to Plaintiff, they are liable for Lanham Act

violations, which violations are based on the acts or omissions of the Karmo Defendants, not

vicarious liability or liability imposed by operation of law as the result of the actions of the Karmo

Defendants. *Langley,* 413 Mich. at 601.  In addition, a party may not recover under a theory of

common-law indemnity if that party's "own negligence played a role in the injury[.]" *Peeples v. City*

*of Detroit*, 99 Mich.App. 285, 292 (1980) (citation omitted).  In this case, there remains a genuine

issue of material fact as to whether the actions or omissions of the Kalabat Defendants resulted in

Plaintiff's injuries.  Accordingly, the Court denies the Kalabat Defendants' motion for summary

judgment with respect to their cross-claim for indemnification.

**C.    Conclusion**

For the reasons set forth in this Section V, the Court grants in part and denies in part the

Kalabat Defendants' Motion for Partial Summary Judgment.

**VI.    PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT ON
THE KALABAT DEFENDANTS' COUNTER-CLAIMS**

37

The Kalabat Defendants filed a three-count Counter-complaint against Plaintiff, wherein they seek recovery for: (1) unjust enrichment (Count I); (2) common law conversion (Count II); and (3) statutory conversion (Count III). Plaintiff has filed a motion for summary judgment with respect to all three claims.

**A.     Unjust Enrichment**

In Count I, the Kalabat Defendants claim that Plaintiff has been unjustly enriched by virtue of the $98,018.04 in payments made by Lenawee Hotel to Plaintiff between January 2004 and November 2005. It is well established in Michigan that unjust enrichment claim is an equitable claim. *See, e.g., Michigan Educ. Empl. Mut. Ins. Co. v. Morris*, 460 Mich. 180, 197-98 (1999). In this case, the Court holds that Plaintiff is entitled to summary judgment on the Kalabat Defendants' unjust enrichment claim because the Kalabat Defendants seek equitable relief with unclean hands.

As discussed in Section IV.B.4. above, the Court concludes that the Kalabat Defendants lack clean hands because they used Plaintiff's protected Days Inn Marks for over four years without disclosing to Plaintiff that there has been a transfer of ownership of the Facility and without applying for or receiving a license from Plaintiff. Moreover, even when the $98,018.04 in payments were being made by the Lenawee Hotel, the Kalabat Defendants were enjoying the use of the Days Inn Marks as they operated the Facility. Accordingly, the Court: (a) concludes that restitution to the Kalabat Defendants for the amounts paid by Lenawee Hotel to Plaintiff would improperly reward infringing parties for their willful misconduct, and (b) holds that the doctrine of "unclean hands" bars the Kalabat Defendants' claim for unjust enrichment. Therefore, the Court grants Plaintiff's motion for summary judgment with respect to the Kalabat Defendants' unjust enrichment claim.

**B.     Common Law Conversion Claim**

38

"Conversion is an unauthorized and wrongful exercise of dominion and control over another's personal property in a manner inconsistent with the rights of the owner." *Sackner Prods., Inc. v. Comtesa, Inc*., No. G89-30212-CA, 1990 U.S. Dist. LEXIS 12438, at *6 (W.D. Mich. Sept. 12, 1990) (*citing Citizens Ins. Co. v. Delcamp Trucking Ctr., Inc*., 178 Mich. App. 570, 575 (1989)). *See also Rib Roof Metal Sys.*, 2008 U.S. Dist. LEXIS 66894, at *37 (citing *Murray Hill Publ'ns, Inc. v. ABC Commc'ns, Inc.*, 264 F.3d 622, 636-37 (6th Cir. 2001)) (common law conversion under Michigan law is defined by "any distinct act of domain wrongfully exerted over another's personal property in denial of or inconsistent with the rights therein.").  In addition, it is well settled law that "[c]onversion is an intentional tort that requires willful conduct on the part of the defendant[,]" *Sackner Prods*., 1990 U.S. Dist. Lexis 12438, at *6-7 (internal citations omitted), though one can commit the tort unwittingly if unaware of the plaintiff,s outstanding property interest.  *Citizens Ins. Co. v. Delcamp Truck Center, Inc.*, 178 Mich. App. 570, 575 (1989) (*citing Warren Tool Co v. Stephenson*, 11 Mich App 274, 299 (1968)).

Withholding property in the face of a demand for its return also can be used to establish conversion. *Citizens*, 178 Mich. App. at 575.  While a check may be the subject of a suit for conversion, checks are considered property of the designated payee. *Echelon Homes, LLC v. Carter Lumber Co.*, 261 Mich.App. 424, 437 (2004) (holding plaintiff did not have standing to bring a conversion claim against defendant based on conversion of a check because the check was not payable to the plaintiff), *rev'd on other grounds at* 472 Mich. 192 (Mich. 2005); *Stewart Title Guar. Co. v. Lockman*, 2008 U.S. Dist. LEXIS 23440, at *24 (E.D. Mich. Mar. 25, 2008).  Moreover, a claim for "conversion of money cannot be maintained unless the defendant had a specific obligation

39

to return money entrusted to the defendant." *Martell v. Turcheck*, No. 2:07-cv-14068, 2008 U.S. Dist. LEXIS 51966, at *29 (E.D. Mich. July 7, 2008) (citation omitted).

The Kalabat Defendants argue that it is undisputed that Plaintiff has retained at least $98,018.04 of Lenawee Hotel's monies, regardless of how Plaintiff applied the payments, and that the retention of such monies demonstrates common law conversion. This argument fails, however, as there is no evidence that Plaintiff intended to wrongfully convert any of the Kalabat Defendants' property. First, the checks submitted were made payable to Plaintiff. Therefore, they were the property of Plaintiff and not the Kalabat Defendants. *Echelon Homes*, 261 Mich.App. at 437. There is no evidence that Plaintiff converted any checks payable to any of the Kalabat Defendants. Second, the Kalabat Defendants have presented no evidence that Plaintiff was ever "entrusted" with any payment where Plaintiff had a "specific obligation" to return the money to the Kalabat Defendants. Third, there is no evidence that by cashing the checks, Plaintiff took any action that was wrongful or unauthorized. Again, the Kalabat Defendants voluntarily submitted checks to Plaintiff that were payable to Plaintiff. Moreover, the checks were earmarked for Licensee's account. Finally, the Kalabat Defendants made no demand for return or surrender of the allegedly "converted" funds prior to Plaintiff filing its Complaint.

Accordingly, as the Kalabat Defendants have failed to produce any evidence to satisfy the elements of a common law conversion claim, the Court grants Plaintiff's motion for summary judgment with respect to that claim.

## C.   Statutory Conversion Claim

M.C.L. § 600.2919a provides, in pertinent part:

(1)   A person damaged as a result of either or both of the following may recover 3 times the amount of actual damages sustained, plus costs and reasonable attorneys' fees:

(a)   Another person's stealing or embezzling property or converting property to the other person's own use.

(b)   Another person's buying, receiving, possessing, concealing, or aiding in the concealment of stolen, embezzled, or converted property when the person buying, receiving, possessing, concealing, or aiding in the concealment of stolen, embezzled, or converted property knew that the property was stolen, embezzled or converted.

In order to prevail on a claim for statutory conversion, however, a claimant must not only satisfy the elements of a common law conversion claim; the claimant also must demonstrate that the defendant had "actual knowledge" of the converting activity. *See, e.g.*, *Echelon Homes,*, 472 Mich. 192, 200 (2005) ("under MCL 600.2919a, constructive knowledge is not sufficient; a defendant must know that the property was stolen, embezzled, or converted."); *Rib Roof Metal Sys.,*, 2008 U.S. Dist. LEXIS 66894, at *36 ("The Michigan Supreme Court has recently clarified that statutory conversion requires 'actual,' and not simply 'constructive,' knowledge" ) (citing *Echelon Homes*, 472 Mich. at 197, 199, 201).

In this case, the Kalabat Defendants have offered conclusory allegations, but no evidence, that Plaintiff had "actual knowledge" that Plaintiff was "converting funds" of the Kalabat Defendants.  At most, the Kalabat Defendants have demonstrated that Plaintiff repeatedly and voluntarily cashed checks submitted to Plaintiff that were earmarked for Licensee's account.  As "Michigan's [statutory] conversion statute places no obligation on [a defendant] to inquire into the status of [property]" (*i.e.,* to determine whether it is converted in the first instance), *Rib Roof,* 2008 U.S. Dist. LEXIS 66894, at *37, Plaintiff had no obligation to so inquire whether the subject property was anything other than what the Kalabat Defendants said it was – payments for Licensee's

41

account. Accordingly, the Kalabat Defendants' statutory conversion claim likewise fails as a matter of law and Plaintiff is entitled to summary judgment with respect to that claim.

**D.    Conclusion**

For the reasons set forth in this Section VI, the Court holds that Plaintiff is entitled to, and grants Plaintiff's Motion for Summary Judgment with respect to, the Counter-complaint (and all claims asserted therein) filed by the Kalabat Defendants.  Accordingly, the Court hereby dismisses with prejudice the Kalabat Defendants' Counter-complaint.

### VII.  CONCLUSION

Accordingly, and for the reasons set forth above, the Court hereby ORDERS that:

1.    The Kalabat Defendants' Motion for Partial Summary Judgment is GRANTED IN PART and DENIED IN PART;

2.    Plaintiff's Motion for Partial Summary Judgment is GRANTED IN PART and DENIED IN PART; and

3.    Plaintiff's Motion for Summary Judgment on the Counter-claims asserted by the Kalabat Defendants is GRANTED.

IT IS SO ORDERED.

S/Lawrence P. Zatkoff
LAWRENCE P. ZATKOFF
UNITED STATES DISTRICT JUDGE

DATED: SEPTEMBER 30, 2009

CERTIFICATE OF SERVICE

THE UNDERSIGNED CERTIFIES THAT A COPY OF THIS ORDER WAS SERVED UPON THE ATTORNEYS OF RECORD BY ELECTRONIC OR U.S. MAIL ON SEPTEMBER 30, 2009.

S/MARIE E. VERLINDE
CASE MANAGER
(810) 984-3290